UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERALD ACKERMAN and
MARK SHAYKIN,

        Plaintiffs,

                                    Civil Case No. 13-14137
v.                                   Honorable Linda V. Parker

HEIDI WASHINGTON,

        Defendant.
_____/

## BENCH OPINION

## I.    Overview

Plaintiffs, and the Class[1] and Sub-Class[2] they represent, are Jewish prisoners

incarcerated in Michigan Department of Corrections ("MDOC") facilities.

---

[1] The Class is defined as follows:

> [A]ll current and future prisoners in Defendant's custody
> who: (a) request, in writing, a religious diet (Kosher
> meals); and (b) either (i) were, as of September 1, 2019,
> designated or identified in Defendant's records as being
> Jewish, or (b) enter Defendant's custody for the first time
> after September 1, 2019 and designate or identify
> themselves as being Jewish upon admission to
> Defendant's custody.

(Settlement Agreement at 2, ECF No. 213 at Pg ID 2177, footnote omitted).

[2] The Sub-Class consists of:

> [A]ll Jewish individuals confined with the Michigan
> Department of Corrections who meet the requirements of
> the main class AND who have a sincere religious belief,

Defendant is the Director of MDOC and is being sued in her official capacity.[3]

Based on their religious beliefs, Plaintiffs and Class members maintain a kosher

diet. MDOC has approved Plaintiffs to receive a kosher diet.

In 2013, MDOC decided to substitute vegan meals for the various religious

diets (e.g., kosher, halal) provided to inmates. Vegan meals contain no meat or

dairy items.

Plaintiffs allege that the vegan diet violates their First Amendment rights and

their rights under the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), 42 U.S.C. § 2000cc-1, because their sincere religious beliefs require

them to consume meat and dairy products on the Sabbath and four Jewish holidays:

Rosh Hashanah, Yom Kippur, Sukkot, and Shavuot (referred to as Plaintiffs' "meat

and dairy claim"). (*See* First Am. Compl., ECF No. 90-1.) Plaintiffs further allege

that even if the vegan meals could be considered kosher, they are rendered non-

kosher by how MDOC washes its trays and utensils (referred to as Plaintiffs'

_____

which is seriously held, that they are to consume
Certified Kosher meat and dairy on each of the Sabbaths
and the following four Jewish holidays: Rosh Hashanah,
Yom Kippur, Sukkot, and Shavuot.
(Stip. Order, ECF No. 201, capitalization in original.)

[3] Because Defendant is sued only in her official capacity as MDOC Director, the
Court will refer to Plaintiffs' claims as against MDOC itself. *See Will v. Michigan
Dep't of State Police*, 491 U.S. 58, 71 (1989) (explaining that "a suit against a state
official in his or her official capacity is not a suit against the official but rather is a
suit against the official's office.").

"cross-contamination claim"). (*see id*.) The parties settled Plaintiffs' cross-contamination claim. (*See* Settlement Agreement, ECF No. 213.) Unable to resolve their meat and dairy claim, the matter proceeded to trial before this Court on October 4, 2019. As "RLUIPA provides greater protection" than the First Amendment, *Holt v. Hobbs*, 135 S. Ct. 853, 862, 574 U.S. 352 (2015), Plaintiffs focus on their statutory claim.

The trial lasted one day, with the parties presenting the following witnesses: Plaintiff Gerald Ackerman; Plaintiff Mark Shaykin; the Director of MDOC's Food Service Management and Support Unit, Kevin Weissenborn; and the Assistant Residential Unit Supervisor at MDOC's Macomb Correctional Facility, Lisa Walsh. At the close of Plaintiffs' case, Defendant made an oral motion pursuant to Federal Rule of Civil Procedure 52, which the Court took under advisement. The parties thereafter filed closing briefs, including their proposed findings of fact and conclusions of law. (ECF No. 217, 219.)

## II.    Findings of Fact

Mr. Ackerman has been an MDOC detainee for twenty years. (10/4/19 Trial Tr. at 19, ECF No. 233 at Pg ID 2314.) He is currently housed at MDOC's Macomb Regional facility, where he has been for almost six years. (*Id*.) Mr. Ackerman practices Judaism. (*Id*. at 20, Pg ID 2315.) He was raised in a Jewish household and his family was strict about religion as he grew up. (*Id*.)

Prior to his incarceration, Mr. Ackerman followed a kosher diet. (*Id*. at 21, Pg ID 2316.) He has tried to adhere to a kosher diet for most of his life. (*Id*.) He participates in Jewish traditions, celebrating the Sabbath and holidays. (*Id.* at 20, Pg ID 2315.) Traditional Sabbath and holiday celebrations included kosher meat or dairy meals. (*Id.* at 20-21, Pg ID 2315-16.) Before he was imprisoned, Mr. Ackerman always ate cheesecake on Shavuot. (*Id.* at Pg ID 2377-78.) Mr. Ackerman regularly attends religious services. (*Id*. at 21, Pg ID at 2316.)

When he was first incarcerated, Mr. Ackerman designated his religion as Jewish. (*Id*. at 22, Pg ID 2317.) He has tried to maintain a kosher diet while incarcerated, but it has been difficult. (*Id*.) For some time, MDOC did not serve kosher meals. (*Id*.) In approximately 2000, while Mr. Ackerman was housed at the Standish Maximum facility, MDOC began providing kosher meals. (*Id*.) The kosher diet included kosher meat and dairy meals. (*Id*.) The meals were sealed and double-wrapped. (*Id*. at 24, Pg ID 2319.)

Mr. Ackerman continued to receive kosher meals until he was transferred to MDOC's Bellamy Creek facility in approximately 2005. (*Id*. at 23, Pg ID 2318.) Mr. Ackerman transferred to the Bellamy Creek facility to be closer to his mother, who was dying. (*Id*.) MDOC did not provide kosher meals at this facility. (*Id*.) Mr. Ackerman spoke with a rabbi about the choice he faced—that is, being closer to his mother before she passed or keeping kosher—and the rabbi told him he was

making the right choice to be closer to his dying mother and would have to do the best he could until he returned to a facility with kosher meals. (*Id.*) Subsequently, a rabbi arranged for Mr. Ackerman's transfer to MDOC's Carson City facility, where he could resume receiving kosher meals. (*Id.*)

In 2013, MDOC substituted a vegan meal plan for all religious diets. (*Id*. at 24, Pg ID 2319.) These meals are not kosher because they are prepared in a non-kosher kitchen and with pans and cooking utensils used in the main, non-kosher kitchen. (*Id.*)

Mr. Ackerman sincerely believes that his religion requires him to consume kosher meat and dairy foods on the Sabbath and four Jewish holidays. (*Id*. at 25, Pg ID 2320.) This mandate comes from the Code of Jewish Law, The Shulchan Aruch. (*Id*. at 24, Pg ID 2319.) The four Jewish holidays are as follows: Shavuot, which celebrates the giving of the Torah to the Jewish people; Sukkot, also known as the Feast of Tabernacles, which celebrates the Jewish people's travels around the desert for forty years and the portable huts they built as they stopped from place to place; Yom Kippur, the day of atonement for one's sins and when God judges whether the coming year will be prosperous or a failure; and Rosh Hashanah, the Jewish new year. (*Id*. at 25-27, Pg ID 2320-22.)

On Sukkot, it is traditional to build a sukkah (a one-man tent) and to eat one's meals inside. (*Id*. at 26-27, Pg ID 2321-22.) On Yom Kippur, Jewish people

fast for twenty-five hours and break the fast with fish (traditionally lox or smoked fish). (*Id.* at 26, Pg ID 2321.) When Mr. Ackerman first arrived at the Macomb Correctional facility, MDOC allowed rabbis to bring kosher food for prisoners, specifically lox to break the Yom Kippur fast. (*Id.*) MDOC has discontinued that practice, however. (*Id.*)

The lack of a traditional kosher meal "reduces the heartfelt meaning of [the holiday] to [the Jewish people]." (*Id.* at 27, Pg ID 2322.) Mr. Ackerman explained, with respect to Yom Kippur:

> It's like we're trying to do everything we can to tell God that we're sorry for the things we've done over the last year, and these are the things he's asked us to do to show that, and when we can't do those things, it diminishes from the fullness of the holiday.

(*Id.*) While there are options to purchase food items in the prison store, most of the kosher products are snack foods. (*Id.*)

There is tuna, but Mr. Ackerman opined that "most rational people couldn't afford [it]." (*Id.*) MDOC's commissary list reflects that 4.32 ounces of tuna costs $4.42.[4] (Def.'s Ex. A at 2.) Several other seafood items (e.g. fish steaks, mackerel

---

[4] Kevin Weissenborn, Director of MDOC's Food Service Management and Support unit, testified that Defendant's trial exhibit "A" reflects the kosher products available for purchase at MDOC's commissaries, minus some cheese products recently added. (10/4/19 Trial Tr. at 108-09, ECF No. 233 at Pg ID 2403-04.) Plaintiffs' counsel has reported that he received letters from inmates at one MDOC facility, complaining that the facility's store sold only three kosher food items. (*See* Pls.' Br. in Supp. of Mot. at 6, ECF No. 232 at Pg ID 2294.) At the hearing on Plaintiff's motion to approve the settlement of their cross-

fillets, sardines) also are available, with portions ranging from 3.53-4 ounces and costs between 95 cents and $3.00. (*Id*.) The commissary list also reflects a five-ounce beef and chicken sausage for $2.28. (*Id*.) Powdered milk is available in a ten-ounce pouch for $3.57. (*Id*.) Plaintiffs testified that this is the only kosher dairy product available for inmates to purchase.[5] (10/4/19 Trial Tr. at 52, ECF No. 233 at Pg ID 2347.)

According to a list Defendant introduced at trial, three varieties of kosher beef sticks can be purchased through the prison commissary for $1.35 each. (Def.'s Ex. A at 2.) Plaintiffs introduced another list reflecting a different brand of kosher beef sticks that are 1.5 or 2 ounces and cost $2.60 and $6.99, respectively.[6] (Pls.' Ex. 3 at 18.) Mr. Ackerman testified that beef sticks do not constitute a meal. (10/4/19 Trial Tr. at 27-28, ECF No. 233 at Pg ID 2322-23.) He further testified that it would cost him approximately $7 to purchase enough beef sticks to

---

contamination claim, defense counsel represented that all prison stores will have the same kosher items available for sale as are set forth on Defendant's trial exhibit A.

[5] The commissary list in fact includes some additional kosher dairy items, such as cheesy rice and macaroni and cheese. Those items, however, must be cooked. As discussed *infra*, this precludes them from being a viable choice for Plaintiffs on the Sabbath and four holidays.

[6] Mr. Weissenborn did not recognize the commissary list offered by Plaintiffs. (10/4/19 Trial Tr. at 134-35, ECF No. 233 at Pg ID 2429-30.) He testified, however, that MDOC's Exhibit A is the current kosher grocery list. (*Id*.)

constitute a meal, or $784 annually for two meals on the Sabbath and four designated holidays. (*Id*. at 29, Pg ID 2324.)

Based on his religious beliefs, Mr. Ackerman may not work on the Sabbath. (*Id*. at 31, Pg ID at 2326.) This precludes him from cooking any kosher foods he can purchase at the prison store. (*Id.* at 31-32, Pg ID 2326-27.) Mr. Ackerman's religious beliefs also prohibit him from asking someone else to perform work (e.g., cook) for him on the Sabbath. (*Id.* at 32, Pg ID 2327.)

Prisoners must purchase their personal toiletries and other necessities, although MDOC does provide toilet paper and soap on a weekly basis. (*Id.* at 29, 148, Pg ID 2324, 2443.) If a prisoner is indigent or has just arrived from intake, MDOC may also provide deodorant and a few small toothpastes and toothbrushes. (*Id*. at 148-49, Pg ID 2443-44.) In a typical month, Mr. Ackerman purchases various items needed for his well-being and hygiene, such as deodorant, soap, allergy pills, over-the-counter medicine, envelopes, JPay[7] stamps and phone cards, shampoo, and conditioner. (*Id*. at 29-30, Pg ID 2324-25.) Pointing to his long, bushy beard, Mr. Ackerman testified that he "use[s] a lot" of the latter two items. (*Id*.)

---

[7] JPay is a company that provides various services for inmates and their family and friends, including methods of communicating such as email, videograms, and phone calls. *See* jpay.com. JPay stamps are required to send and receive emails, and an inmate must use money to purchase phone time. *Id*.

In addition to hygiene products, Mr. Ackerman regularly buys coffee from the commissary.[8] (*See* Def.'s Ex. C.) For example, on August 12, 2018, he ordered ten, three-ounce pouches of freeze-dried coffee, totaling $36.20 ($3.62 per pouch). (*Id.* at 12; *see also* Def.'s Ex. A at 1.) Approximately a month later, on September 9, 2018, he ordered eight, three-ounce pouches totaling $28.96. (*Id.*) Mr. Ackerman next purchased $28.96 worth of coffee in October and again in November 2018. (*Id.* at 12-13.) Mr. Ackerman's commissary purchases between August 12, 2018 and July 28, 2019, regularly included coffee; they did not include kosher meat or dairy items. (*Id.* at 12-16; *see also* 10/4/19 Trial Tr. at 46, ECF No. 233 at Pg ID 2341.)

According to Mr. Ackerman, he purchases coffee for his own consumption, but also to trade with other inmates for items he was not able to purchase at the store or that he runs out of before he is able to return to the store.[9] (10/4/19 Trial Tr. at 51, 53, ECF No. 233 at Pg ID 2346, 2348.) He explained that there is no monetary system in prison other than store goods, and coffee is the most tradeable commodity. (*Id.*)

---

[8] Mr. Ackerman's past purchases reflect that he buys coffee bi-monthly or monthly. (*See* Def.'s Ex. C.)

[9] Inmates are allowed to go to the store twice a month. (10/4/19 Trial Tr. at 53, ECF No. 233 at Pg ID 2348.)

Mr. Ackerman works in the prison as a horticulture tutor. (10/4/19 Trial Tr. at 30, Pg ID 2325.) He earns $2.62 a day in this position and had a monthly average salary of $60.24 in 2019. (*Id.*) He has worked other prison jobs during his incarceration and this is roughly the highest amount he has earned in any position. (*Id.*) The lowest paid job he has held in prison was as a porter, for which he earned 84 cents per day. (*Id.* at 31, Pg ID 2326.) Most prisoners do not make what Mr. Ackerman earns. (*Id.*) Even with what he earns, Mr. Ackerman is not able to consistently purchase kosher meat and dairy items from the commissary. (*Id.*)

Mr. Shaykin has been an MDOC prisoner since 2009. (*Id.* at 55, Pg ID 2350.) He is presently confined at the Macomb Correctional facility. (*Id.*)

Mr. Shaykin was raised Jewish and grew up attending temple on the Sabbath. (*Id.* at 54, Pg ID 2349.) His religious beliefs require him to keep a kosher diet and he has kept kosher to the best of his ability his entire life. (*Id.* at 54-55, Pg ID 2349-50.) On the Sabbath and religious holidays, this meant eating kosher meats and dairy. (*Id.* at 55, Pg ID 2350.) On Shavuot, he is required to consume dairy, but traditionally he always had cheesecake. (*Id.* at 63, Pg ID 2358.) Mr. Shaykin testified that he believes any kosher dairy product would satisfy his religious requirements; however, he feels that his religious beliefs are better satisfied by consuming cheesecake on Shavuot. (*Id.* at 74, 75, Pg ID 2369, 2370.)

Mr. Ackerman also always had cheesecake on Shavuot, and he described its consumption on the holiday as a "ritual". (*Id.* at 85, Pg ID 2380.) When asked whether consuming any dairy product on Shavuot would be acceptable, Mr. Ackerman answered "No," explaining:

> Well, you know, I think with any religion, I don't think Judaism is exceptional in any case, like it's not unlike other religions. These ritual practices we have mean a great deal to us, so when we have the ability to fulfill it properly, we feel obligated to do so.
> …
> And I guess that's the best answer I can give you. Sure, I mean, arguably, we could drink a glass of milk, and that's fine, but that's not how we celebrate Shavuot in giving of the written law that we abide by.

(*Id.* at 85-86, Pg ID 2380-81.)

The Shulchan Aruch does not specify that cheesecake must be consumed on Shavuot. (*Id.* at 86-87, Pg ID 2381-82.) It does state that "[s]ome have a custom" of eating "dairy mezonot, cake" on the holiday. (*Id.* at 88, Pg ID 2383; Pl.'s Ex. A at 43.) To Mr. Shaykin, that means cheesecake. (10/4/19 Trial Tr. at 89, Pg ID 2384.)

Mr. Shaykin explained that kosher food is processed in a strict rabbinical manner in that a rabbi blesses the food at the plant and oversees how it is processed and, in the case of meat, the animal is slaughtered. (*Id.* at 55, Pg ID 2350.) When Mr. Shaykin fails to adhere to a kosher diet, he believes he is not fulfilling God's commandment. (*Id.*) According to the Shulchan Aruch, he must consume meat

and dairy products and is "credited" for doing so. (*Id*. at 56-57, Pg ID 2351-52.)
By not consuming meat and dairy products, Mr. Shaykin believes he is "not
fulfilling what [he's] supposed to do" and is "being empty of everything of what
[he's] doing." (*Id*.)

Prior to 2013, MDOC provided kosher double-wrapped packaged meals to
inmates approved for a kosher diet. (*Id*. at 58, Pg ID 2353.) These meals
contained meat and dairy products. (*Id.* at 57-58, Pg ID 2352-53.) Rabbis from
the Aleph Institute[10] also brought Jewish inmates kosher pastrami, salmon, and
cheesecake on the high holidays. (*Id.* at 62-63, Pg ID 2357-58.) Beginning in
2013, MDOC stopped providing kosher meals to inmates, with the exception of the
Passover holiday, and inmates approved for a kosher diet stopped receiving meat
and dairy products. (*Id*. at 56-57, Pg ID 2351-52.) MDOC also stopped allowing
outside organizations to bring kosher food to the prisoners. (*Id*. at 62, Pg ID 2357.)

Prisoners may purchase kosher meat and dairy products from the
commissary. (*Id*. at 58, Pg ID 2353.) Mr. Shaykin acknowledged on cross-
examination that the prison store sells several kosher meat and seafood items at the
prices listed on Defendant's trial exhibit. (*Id.* at 64-67, Pg ID 2359-62; *see also*

_____

[10] The Aleph Institute is a "non-profit Jewish organization dedicated to assisting
and caring for the wellbeing of members of specific populations that are isolated
from the regular community" such as United States military personnel, prisoners,
institutionalized individuals, and individuals at risk of incarceration due to mental
illness or addiction. *See* https://aleph-institute.org/wp/about/.

Def.'s Ex. A.) He indicated that kosher beef sticks only became available at the start of 2019. (10/4/19 Trial Tr. at 76-77, ECF No. 233 at Pg ID 2371-72.) There were hardly any kosher products, but "lately they've been adding more and more …." (*Id.* at 77, Pg ID 2372.)

Mr. Shaykin also acknowledged that the prison store sells ten ounces of kosher powdered milk for $3.57. (*Id.* at 58, 67, Pg ID 2353, 2362.) When asked about the kosher cheesy rice and macaroni and cheese on the prison store list, Mr. Shaykin did not contest that these items are sold. (*Id*. at 67, Pg ID 2362.) He indicated, however, that these items do not satisfy his need for dairy on the Sabbath and four holy days because they must be cooked and he would have to double the amounts to constitute a meal. (*Id.*) Mr. Shaykin testified that he is not able to afford the kosher meat and dairy products each week for the Sabbath. (*Id.* at 58, Pg ID 2353.)

Mr. Ackerman elaborated on why purchasing the items on the store list would not satisfy his and Mr. Shaykin's religious beliefs, even if they could afford to purchase them for the fifty-six Sabbath and specified holiday meals. (*Id*. at 96-99, Pg ID 2391-94.) As he explained, the Torah refers in many places to amounts, but the Shulchan Aruch talks about "meals" when referring to what should be consumed on the Sabbath and holidays. (*Id.* at 96-97, Pg ID 2391-92.) As a reference, Mr. Ackerman indicated that a "meal" in prison consists of a four-ounce

serving of meat.  (*Id*. at 97, Pg ID 2392.)  While Mr. Ackerman acknowledged that

four ounces of beef stick might then be a "meal," he testified that it would not

comport with his religious belief that the Sabbath and holidays are supposed to be

a "celebration."  (*Id*. at 97-98, Pg ID 2392-93.)  He explained:

> [H]e [referring to God] didn't say we need you to eat a side of beef,
> but we need you to eat a meal, we expect you to eat a joyful meal, and
> [the] code of Jewish law here says delicacy.  Well, obviously, in
> prison I'm not expecting any delicacies.

(*Id*. at 98, Pg ID 2393.)

Mr. Ackerman provided that supplementing the vegan meals (if they were

kosher) with a purchased beef stick, some powdered milk, or a cheese product

would not satisfy his religious beliefs because prison policy forbids inmates from

bringing food (except seasoning) into the chow hall and eating the items separately

would not be part of his meal.  (*Id*. at 101-02, Pg ID 2396-97.)  Moreover, the meat

or dairy item is supposed to be the main portion of the meal, that is, the entree.  (*Id*.

at 102, Pg ID 2397.)

Mr. Shaykin makes $1.14 a day working in segregation, or roughly $7.98

per week or $416.10 a year.  (*Id*. at 58-59, Pg ID 2353-54.)  He earned the same

salary in his prior job as a porter.  (*Id*. at 59, Pg ID 2354.)  He knows of other

inmates who earn less.  (*Id*.)

An MDOC policy allows for inmates whose accounts remain below $11 in a

calendar month to obtain an $11 loan from the department.  (*Id.* at 143, Pg ID

2438.)  An excerpt from the Shulchan Aruch, quoted by Mr. Ackerman during his trial testimony, reads: "Every person should prepare fine meat, fish, choice wine, and other delicacies for the Sabbath meals to the fullest extent of his means."  (*Id*. at 97, Pg ID 2392.)

At the prison store, Mr. Shaykin typically buys coffee and envelopes.  (*Id*.) Every now and then he buys chips.  (*Id*.)  The record of Mr. Shaykin's commissary purchases reflect that on May 20, 2018, he bought $28.96 worth of coffee and $15.30 worth of microwave popcorn.  (*Id.* at 71-72, Pg ID 2366-67; Def.'s Ex. B at 9.)  Approximately one month later, he purchased $37.52 worth of coffee and $13.26 worth of microwave popcorn.  (10/4/19 Trial Tr. at 72, ECF No. 233 at Pg ID 2367; Def.'s Ex. B at 9-10.)  On July 29, 2018, he purchased $21.72 worth of coffee and $10.20 worth of microwave popcorn.  (10/4/19 Trial Tr. at 72, ECF No. 233 at Pg ID 2367; Def.'s Ex. B at 10.)  Mr. Shaykin also uses his earnings to put money in his JPay account.  (10/4/19 Trial Tr. at 59-60, ECF No. 233 at Pg ID 2354-55.)  Mr. Shaykin uses the coffee he buys to barter with other inmates for other goods, such as deodorant, because he can get items cheaper that way.  (*Id*. at 60, Pg ID 2355.)  Coffee, he explained, is worth more than a hygiene product. (*Id*.)

Lisa Walsh, an assistant residential unit supervisor at MDOC's Macomb Correctional facility, testified that bartering is against housing unit rules.  (10/4/19

Trial Tr. at 144, Pg ID 2439.)  Ms. Walsh indicated that she and MDOC officers have the discretion to discipline an inmate for bartering.  (*Id*.)  Discipline could include a verbal reminder that bartering is prohibited or a misconduct charge.  (*Id*.)  Ms. Walsh recognized, however, that bartering is part of the prison subculture.  (*Id*. at 150, Pg ID 2445.)

Mr. Shaykin has a lot of health care issues for which he receives medications through the prison by paying a healthcare co-pay.  (*Id*. at 60, Pg ID 2355.)  One of his issues is a vitamin B-12 deficiency.  (*Id*.)  For treatment, he receives vitamin B-12 shots and was advised to be on a meat diet, which would require him to go off the kosher diet.  (*Id*. at 61, Pg ID 2356.)  Mr. Shaykin chooses to remain on the kosher diet.  (*Id*.)

Kevin Weissenborn, Director of MDOC's Food Service Management and Support unit, testified that it currently costs MDOC $2.85 per meal to feed each inmate in the general prison population.  (*Id*. at 109-10, Pg ID 2404-05.)  The cost is approximately $2.97 for prisoners receiving the vegan meal.  (*Id*. at 110, Pg ID 2405.)  Mr. Weissenborn testified that it would cost an additional $10,000 annually to provide meat and dairy products on the Sabbath and four holidays to the eighty-five Jewish inmates who are on a religious diet.[11]  (*Id*. at 110-11, 116, Pg ID 2405-

---

[11] Mr. Weissenborn indicated that this $10,000 figure contemplates providing a milk product at breakfast and a meat product at dinner on those occasions. (10/4/19 Trial Tr. at 120, ECF No. 233 at Pg ID 2415.)

06, 2411.) He explained that the additional cost is really to provide meat at one of the meals on those fifty-six days, as there is no additional cost to MDOC to provide dairy products. (*Id.* at 122, Pg ID 2417.) MDOC reached this estimate by working with its food vendor to identify suitable (i.e., good quality and good quantity) food products. (*Id.* at 111-12, Pg ID 2406-07.)

Mr. Weissenborn acknowledged that this cost could be lower, but he maintained that MDOC did not go with a lower cost due to the quality of the food that would then be provided. (*Id.*) Mr. Weissenborn testified that it would cost MDOC approximately $400,000 annually to provide prepackaged kosher meals, three times a day, to inmates approved for a kosher diet. (*Id.* at 112, Pg ID 2407.) The annual food service budget for the entire MDOC prison system is approximately $39 million. (*Id.* at 134, Pg ID 2429.)

## III.    Conclusions of Law

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). Under RLUIPA, MDOC cannot "impose a substantial burden on the religious exercise of [its inmates] … unless [MDOC] demonstrates that [it] ... (1) is in furtherance of a compelling governmental interest; and (2) is the

least restrictive means of furthering that compelling governmental interest." 42 U.S.C.§ 2000cc-1.  A burden shifting framework applies to RLUIPA claims.

The plaintiff has the initial burden to make two showings: (1) he or she has a "sincerely held religious belief" and (2) the government's action or policy "substantially burden[s] that exercise" by, for example, forcing the plaintiff "to 'engage in conduct that seriously violates [his or her] religious beliefs.' "  *Holt v. Hobbs*, 135 S. Ct. 853, 862, 574 U.S. 352, -- (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014)).  If the plaintiff satisfies this burden, the government must then show that its action or policy (1) is "in furtherance of a compelling governmental interest" and (2) "is the least restrictive means of furthering that … interest."  42 U.S.C. § 2000cc-1.

When evaluating Plaintiffs' claim, this Court must keep in mind RLUIPA's "expansive protection for religious liberty."  *See Holt*, 135 S. Ct. at 860; *see also* 42 U.S.C. § 2000-3(g) ("This chapter shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.").

## A.     Sincerely Held Religious Belief

RLUIPA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  This protection "is not limited to beliefs which are shared by all members of a religious

18

sect." *Holt*, 135 S. Ct. at 862-63 (additional quotation marks and citation omitted).

RLUIPA's definition of religious exercise covers "not only belief and profession

but the performance of physical acts such as assembling with others for a worship

service [or] participating in sacramental use of bread and wine." *Cutter*, 544 U.S.

at 720 (ellipsis, brackets, quotation marks and citation omitted).

However, a prisoner's request for an accommodation must be based on a

religious belief and not some other motivation. *Hobby Lobby*, 573 U.S. at 717

n.28; *Holt*, 135 S. Ct. at 862. The court may inquire "into the sincerity of a

prisoner's professed religiosity." *Cutter*, 544 U.S. at 725 n.13. " 'While the truth

of a belief is not open to question, there remains the significant question of whether

it is truly held.' " *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781,

790-91 (5th Cir. 2009), aff'd sub nom. *Sossamon v. Texas*, -- U.S. --, 131 S. Ct

1651 (2011) (quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965)).

While sincerity is important, "it must be handled with a light touch, or

'judicial shyness.' " *Id*. at 792 (quoting *AA ex rel. Betenbaugh v. Needville Indep.

Sch. Dist.*, 611 F.3d 248, 262 (5th Cir. 2010)). As the Tenth Circuit has advised,

the sincerity inquiry " 'is almost exclusively a credibility assessment[.]' " *Kay v.

Bemis*, 500 F.3d 1214, 1219 (2007) (quoting *Snyder v. Murray City Corp.*, 124

F.3d 1349, 1352 (10th Cir. 1997)). "To examine religious convictions more

deeply[,]" the Fifth Circuit warned, "would stray into the realm of religious

inquiry, an area into which [courts] are forbidden to tread." *Moussazadeh*, 703
F.3d at 792.

"Sincerity is distinct from reasonableness." *New Doe Child #1 v. Congress
of the United States*, 891 F.3d 578, 586 (6th Cir. 2018). "[I]t is not within the
court's purview to question the reasonableness of [a plaintiff's sincerely held
religious beliefs]." *Id*. "Nor is it the court's role 'to say that [a plaintiff's]
'religious beliefs are mistaken or insubstantial.' " *Id*. at 586-87 (quoting *Hobby
Lobby*, 573 U.S. at 725). As the Sixth Circuit has stated: "RLUIPA protects a
broad spectrum of sincerely held religious beliefs, including practices that non-
adherents might consider unorthodox, unreasonable or not 'central to' a recognized
belief system." *Haight v. Thompson*, 763 F.3d 554, 565 (2014) (quoting 42 U.S.C.
§ 2000cc-5(7)(A)).

The Court has no trouble concluding from the evidence that Plaintiffs
sincerely believe their religion requires them to consume meat and dairy on the
Sabbath and the Jewish holidays of Rosh Hashanah, Yom Kippur, Sukkot, and
Shavuot. More specifically, it shows that Plaintiffs sincerely believe the quantity
of meat and dairy they consume must constitute or be part of a "meal"—"a joyful
meal." They interpret the Code of Jewish Law as dictating this as God's
commandment. Plaintiffs spoke about the specific meat and dairy dishes they

traditionally consumed on these occasions, prior to their incarceration.  They also testified that they have tried to follow this religious mandate their entire lives.

Based on Supreme Court and Sixth Circuit precedent, the Court also is convinced that it must accept Plaintiffs' assertion that eating cheesecake on Shavuot is a Jewish ritual, which they sincerely believe must be followed to observe the holiday properly.  As noted above, RLUIPA defines " 'religious exercise' capaciously to include 'any *exercise* of religion, whether or not compelled by, or central to, a system of religious belief.' "  *Holt*, 135 S. Ct. at 860 (quoting 42 U.S.C. § 2000cc-5(7)(A)) (emphasis added).  RLUIPA's protections are "not limited to beliefs which are shared by all of the members of a religious sect."  *Id.* at 862-63.  RLUIPA has been found to protect traditional rituals, such as the drinking of wine for a communion service, the annual powwow of Native Americans, and the consumption of specific traditional foods for certain Native American ceremonies.  *See, e.g., Haight*, 763 F.3d at 564 ("A powwow is indisputably a religious ceremony for members of this Native American Church, and, so far as this record shows, the inmates sincerely believe that a meal accompanied by corn pemmican and buffalo meat is part of that ceremony.  The prison's decision to bar corn pemmican and buffalo meat 'effectively bars' the inmates from this religious practice and forces them to 'modify their behavior' by performing less-than-complete powwows with less-than-complete meals.")

(brackets omitted); *Schlemm v. Wall*, 219 F. Supp. 3d 924, 928 (W.D. Wis. 2016) ("The court has no trouble concluding that plaintiff's request for venison or other game meat at the annual Ghost Feast is motivated by a sincerely held religious belief. Plaintiff testified credibly at trial that: (1) the Ghost Feast is essential to his Native American religious practice and (2) traditional foods, including game meat, must be served for the feast. … Plaintiff testified that without the traditional foods of game meat and fried bread, the Ghost Feast would lack religious significance for him.") Neither this Court nor the government may "inquire into the centrality to a faith of certain religious practices—dignifying some, disapproving of others." *Haight*, 763 F.3d at 566.

The Court found Plaintiffs sincere and credible. The fact that they may have consumed or purchased non-kosher food at some point does not alter the Court's conclusions:

> A finding of sincerity does not require perfect adherence to beliefs expressed by the inmate, and even the most sincere practitioner may stray from time to time. "A sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?"

*Id.* at 791-92 (brackets omitted) (quoting *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012)).

### B.  Substantial Burden

Plaintiffs maintain that MDOC's policy of serving a vegan diet in lieu of a kosher diet that includes meat and dairy violates their sincere religious beliefs because it completely precludes them from consuming kosher meat and dairy on the occasions when their religion commands it.  While MDOC makes kosher meat and dairy items available for purchase through the prison store, Plaintiffs assert several persuasive reasons why this does not alleviate the burden on them.[12]

First, the serving sizes of the items sold are insufficient to constitute a meal. Second, prison policies prohibit Plaintiffs from bringing the items into the chow hall and Jewish "law requires [them] to have a [Sabbath or holiday] meal, not to have a meal and then supplement it later at some other time."  (10/4/19 Trial Tr. at 101, ECF No. 233 at Pg ID 2396.)  Lastly, due to their indigency, Plaintiffs maintain that they are not able to purchase meat and dairy products, generally, and more specifically, in the quantities needed to constitute a Sabbath or holiday meal.

Highlighting Plaintiffs' coffee purchases, MDOC attempts to dispute their asserted inability to pay for the kosher commissary items.  MDOC suggests that if Plaintiffs can afford these coffee purchases, they can afford to purchase kosher meat and dairy items from the commissary for Sabbath and holiday meals to satisfy

---

[12] MDOC's policies, including the prohibition on outside groups delivering kosher food items for Jewish prisoners, result in Plaintiffs having no access to cheesecake. It is not an item sold at the prison store.

their religious beliefs.  Plaintiffs explained why they regularly purchase coffee, however.

Notwithstanding that bartering is forbidden under MDOC policy, Plaintiffs use the coffee to buy goods from other inmates in between their allowed purchases at the prison store (for example, when they have run out of hygiene necessities) and to purchase goods at prices lower than they are sold through the store.  Coffee is the most tradeable commodity.  Thus, all of the coffee Plaintiffs purchase is not for their own consumption.  Rather, the purchases are a means for Plaintiffs to obtain other necessities.

In any event, even if Plaintiffs forewent their coffee purchases and used the same funds to purchase kosher meat and dairy products on the Sabbath and designated Jewish holidays, this would not eliminate the additional reasons Plaintiffs gave for why such commissary purchases would not satisfy the dictates of their religious beliefs.[13]

The Seventh Circuit's recent decision in *Jones v. Carter*, 915 F.3d 1147 (2019), also is instructive in responding to MDOC's ability-to-pay argument.  In

---

[13] MDOC essentially ignores Plaintiffs' additional arguments.  It does contend in its proposed findings of fact and conclusions of law that the evidence "proved that suitable meat entrées are available for purchase by the Plaintiffs for as low as $.95."  (Def.'s Closing Br. at 8, ECF No. 219 at Pg ID Pg ID 2237.)  The ninety-five cent items are not meat or dairy products, however.  They are seafood products.  Further, the Court is hard-pressed to describe these items, or the meat and dairy items, as "entrées."

that case, a Muslim prisoner filed suit when the Indiana Department of Correction

substituted a vegan diet for pre-packaged kosher meal trays that included kosher

meat and were provided to inmates who requested them for religious reasons. *Id*.

at 1148. The plaintiff claimed that the holy Qur'an commands him to eat meat and

that the vegan diet therefore violated his religious beliefs. *Id.* The Seventh Circuit

affirmed the district court's holding that the plaintiff was substantially burdened by

the vegan diet even though he could have purchased the halal meat he to needed to

supplement his diet at the prison commissary. *Id*. at 1152.

Looking to the Supreme Court's decision in *Hobby Lobby*, the Seventh

Circuit declined to inquire deeply into the plaintiff's ability to afford meat from the

commissary:

> When the Supreme Court was presented with a far sparser record
> supporting the claimed substantial burden in *Hobby Lobby* … the
> Court declined to inquire further into the question of ability to pay,
> despite criticism in dissent both at the Court and in the Tenth Circuit.
> Instead, it gave greater weight to the religious freedom concerns and
> implicitly disapproved the ability-to-pay aspect of the earlier opinions
> from our sister circuits. *Hobby Lobby*, 134 S. Ct. at 2775-76 (finding
> the large fines were clearly a substantial burden without requiring
> Hobby Lobby to prove its inability to pay or whether the fines would
> be "merely" significant or actually crippling); *id* at 2798 (Ginsburg, J.,
> dissenting) (criticizing the majority opinion for "barely paus[ing] to
> inquire whether any burden imposed ... is substantial"); *Hobby Lobby
> Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1164 (10th Cir. 2013)
> (Briscoe, J., concurring in part and dissenting in part) ("At the hearing
> on plaintiffs' motion for preliminary injunction, plaintiffs presented
> no evidence of any kind. … As a result, we know very little about any
> of the important facts of this case" including evidence of substantial
> burden); *id*. at 1181, 1181 n.4 (10th Cir. 2013) (Matheson, J.,

concurring in part and dissenting in part) (expressing concern that "plaintiffs have provided almost no evidence" including "plaintiffs have failed, for example, to provide the district court with complete information about the financial strain they would bear"). The Supreme Court thus consciously chose not to require a demonstration of hardship—or detailed findings on finances—before determining that the fine at issue triggered protection for Hobby Lobby's owners. *Hobby Lobby*, 134 S. Ct. at 2759.

*Jones*, 915 F.3d at 1151. The Seventh Circuit concluded that the prisoner before it was "entitled to no less" than the corporation before the Supreme Court in *Hobby Lobby*. *Id*. The Seventh Circuit also found a substantial burden where the prison was "in effect demanding that [the plaintiff], uniquely among all inmates, zero out his account and forego purchasing other items such as hygiene products or over-the-counter-medicine, if he wants to avoid a diet that violates his religious beliefs." *Id*. at 1150.

MDOC also refers the Court to a portion of the Shulchan Aruch quoted by Mr. Ackerman during his trial testimony: "Every person should prepare fine meat, fish, choice wine and other delicacies for the Sabbath meals to the fullest extent of his means." (10/4/19 Trial Tr. at 104, ECF No. 233 at Pg ID 2399.) Referring to the definition of "means" in Black's Law Dictionary—"[a]vailable resources, esp. for the payment of debt; income"—MDOC argues in its closing brief:

Therefore, with the limited means available to prisoners, Plaintiffs' sincere religious beliefs do not require them to observe their religious obligations with the same fervency and extravagance that they would on the outside. In fact, Plaintiffs' religious beliefs *seem* to account for those who are less well-off, obliging them only to leap over the

> highest hurdle that is economically feasible based on their own
> personal circumstances.

(Def.'s Closing Br. at 9, ECF No. 219 at Pg ID 2238, emphasis added.) There was no evidence presented as to what this excerpt from the Shulchan Aruch means, most importantly, to Plaintiffs. Plaintiffs did testify, however, that they believe their religious beliefs require them—despite their prison status and indigency—to consume meat and dairy during the Sabbath and four holidays. And as stated earlier, the Court found this belief to be sincere.

Further, in *Holt*, the Supreme Court concluded that the district court had "committed … error in suggesting that the burden on [the inmate]'s religious exercise was slight because, according to [the inmate]'s testimony, his religion would 'credit' him for attempting to follow his religious beliefs, even if that attempt proved to be unsuccessful." *Id*. at 862. The Supreme Court reasoned that "RLUIPA applies to the exercise of religion regardless of whether it is 'compelled.' " *Id*. (quoting 42 U.S.C. § 2000cc-5(7)(A)). Therefore, this Court would find a substantial burden on Plaintiffs' religious beliefs even if evidence was presented showing that the above-quoted excerpt means that those unable to afford meat and dairy on the Sabbath are not compelled to partake in this religious exercise.

**C.	Compelling Governmental Interest**

RLUIPA subjects governmental action to strict scrutiny, *Haight*, 763 F.3d at 566, and "does not permit … unquestioning deference" to a prison system's assertion of what will undermine its interests. *Holt*, 135 S. Ct. at 864. Nevertheless, "courts should not blind themselves to the fact that the analysis is conducted in the prison setting." *Id.* at 866. Courts must remember that "[p]rison officials are experts in running prisons and evaluating the likely effects of altering prison rules, and … should respect that expertise." *Id.* at 864. While the Court must "respect prison officials' expertise" it must not "abandon 'the responsibility, conferred by Congress, to apply RLUIPA's rigorous standard.' " *Id.* (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 434 (2006)).

MDOC argues that it "has a compelling governmental interest in the costly and orderly administration of prisoner meals." (Def.'s Closing Br. at 3, ECF No. 219 at Pg ID 2232.) Its evidence in support of this interest was not extensive and suggested that MDOC had not given a lot of thought to alternative means to achieve its desired goals. In fact, it appeared to the Court that MDOC had only gathered figures related to cost for purposes of this litigation. As the Sixth Circuit observed in *Haight*: "[E]xplanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to disclose whether the

new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations.  Only the true explanations for the policy count."  *Id*. at 562.

In any event, according to Mr. Weissenborn, it would cost an additional $10,000 annually to provide a suitable meat product at dinner on the Sabbath and four holidays to eighty-five prisoners approved for a kosher diet.[14]  MDOC's total annual food service budget is approximately $39 million.  " 'Cost reduction, as a general matter, is unquestionably a compelling interest of [a prison system].' "  *Ali v. Stephens*, 822 F.3d 776, 792 (5th Cir. 2016) (brackets omitted) (quoting *Moussazadeh*, 703 F.3d at 795).  Nevertheless, RLUIPA anticipates that it "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise."  42 U.S.C. § 2000cc-3(c); *Holt*, 135 S. Ct. at 860; *Hobby Lobby*, 573 U.S. at 695.  Moreover, "in determining whether a cost is compelling, a court may need to 'put the amount in perspective' by measuring the projected expense against the resources devoted to that interest."  *Ali*, 822 F.3d at 792 (quoting *Moussazadeh*, 703 F.3d at 795).

---

[14] Mr. Weissenborn also presented the Court with a $400,000 annual cost for providing complete pre-packaged kosher meals.  However, MDOC already has agreed to provide pre-packaged kosher meals in its settlement of Plaintiffs' cross-contamination claim.  Mr. Weissenborn did not provide a cost for adding meat and dairy to the prepackaged meals on the Sabbath and four holidays.

In *Moussazadeh*, the evidence showed that the annual cost to provide kosher food to all observant prisoners "would only be about $88,000 per year." The Texas Department of Criminal Justice's total annual food budget was $183.5 million. *Id.* The Fifth Circuit was "skeptical that saving less than .05% of the food budget constitutes a compelling interest." *Id.* The court relied on *Beerheide v. Suthers*, 286 F.3d 1179 (10th Cir. 2002), where the Tenth Circuit held that excluding a $13,000 expenditure from a budget of over $8 million did not constitute a compelling government interest, even under rational-basis review. *Beerheide*, 286 F.3d at 1191; *see also Ali*, 822 F.3d at 797 (saving $39,221 per year to accommodate the plaintiff's religious belief, out of a total annual budget of $1.045 billion, did not serve compelling interest in cost control). Similarly, here, when put in perspective, the $10,000 asserted annual cost to accommodate Plaintiffs' religious beliefs is de minimis and does not demonstrate a compelling interest justifying the burden placed on those religious beliefs.

Further, at least two Circuit Courts have found a State's asserted interest less compelling when the State previously accommodated the plaintiff's religious beliefs. *United States v. Sec., Fl. Dep't of Corrections*, 828 F.3d 1341, 1347-48 (11th Cir. 2016) ("The Secretary … fails to explain how she has a compelling governmental interest in not providing kosher meals to inmates now even though she voluntarily provided them in 2013"); *Moussazadeh*, 703 F.3d at 794-95

(finding the strength of the State's interest in denying kosher food "dampened by the fact that it has been offering kosher meals to prisoners for more than two years and provides them at no cost to all observant Jewish inmates that accepted a transfer to [a certain prison].").

Finally, Plaintiffs identify an alternative to MDOC incurring at least some of these costs. According to Plaintiffs, until recently, MDOC allowed outside organizations, such as Aleph, to donate kosher meat and dairy products for inmates. MDOC has not offered any explanation for why this practice was discontinued, nor has it set forth a reason why it cannot be allowed.

MDOC also argues that a ruling in Plaintiffs' favor "will open the door for requests to be granted to each of the 28 recognized religions." (Def.'s Closing Br. at 11, ECF No. 219 at Pg ID 2240.) According to MDOC, this threatens to put further pressure on its budget and orderly administration of prison meals. (*Id.*) The Court is somewhat surprised that MDOC asserts this argument, as the Supreme Court, Sixth Circuit, and other courts routinely dismiss it out of hand. *See, e.g., Holt*, 135 S. Ct at 866; *Haight*, 763 F.3d at 562; *Secretary, Fl. Dep't of Corr.*, 828 F.3d at 1348. When the defendant raised a similar alarm in *Haight*, the Sixth Circuit responded as follows:

> Nor does the warden strengthen his claim by warning that, if he grants this accommodation, he will have to grant others, having set a precedent with the "first" accommodation. … the Supreme Court already rejected a like-minded contention. This kind of argument, as

the Chief Justice put it, represents "the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436, 126 S. Ct. 1211, 163 L.Ed.2d 1017 (2006). Just as a no-exceptions policy failed to work in *O Centro*, it fails to work here on this threadbare record. Keep in mind that the idea behind offering statutory protection for faith-based practices is to make accommodations—exceptions—for individuals who believe they must do certain things because their faith requires it. Rejecting accommodation requests on the ground that an exception to a general prison policy will make life difficult for prison wardens is a fine idea in the abstract … But it has no place as a stand-alone justification under RLUIPA.

763 F.3d at 562.

MDOC has not identified a "compelling interest" related specifically to Plaintiffs' request for cheesecake on Shavuot. Had MDOC done so, the Court expects that its argument would have been similar to the prison officials' response in *Haight* to the request of Native American inmates for specific foods for their annual powwow:

[I]f failing to give Native American inmates corn pemmican and buffalo meat for an annual powwow amounts to a RLUIPA-triggering "substantial burden" on their religious beliefs, what's next? Will not prison officials, already faced with vexing security challenges, "be held hostage to every inmate's outlandish religious requests," including everything from requests for "Papa John's pizza" to "Jacuzzi[s]" to "daily conjugal visits" and all sorts of things in between?

763 F.3d at 565. This Court will respond as the Sixth Circuit did in *Haight*: "The point is a fair one. But there are at least three other ways to handle inmate demands gone wild." *Id.*

"First," as the *Height* court explained, "nothing in RLUIPA bars a prison from 'questioning whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic.'" *Id.* at 565 (emphasis removed) (quoting *Cutter*, 544 U.S. at 725 n.13). "Second … [t]he State still may show that its policy furthers a compelling governmental interest and does so in the least restrictive way." *Id.* at 566 (emphasis removed). "Third, RLUIPA … represents an effort to protect religious liberties by statute . . . in a serious way." *Id.* (emphasis removed) (citing 42 U.S.C. § 2000cc-3(g)). "It goes without saying … that one virtue of legislative protections, as opposed to constitutional ones, is that they can be modified more readily if they over-protect or under-protect a right." *Id.*

For these reasons, the Court concludes that MDOC has not met its burden of demonstrating that it has a compelling interest in not providing meat and dairy products to Plaintiffs and the Sub-Class on the Sabbath and holidays of Rosh Hashanah, Yom Kippur, Sukkot, and Shavuot.

## D.    Least Restrictive Means

"'The least-restrictive-means test is exceptionally demanding,' and it requires the government to 'show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party.'" *Holt*, 135 S. Ct at 864 (brackets omitted) (quoting *Hobby Lobby*, 573 U.S. at 728). "'If a less restrictive means is available for the

Government to achieve its goals, the Government must use it.' " *Id.* (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000)). As discussed above, MDOC fails to establish that it could not satisfy its cost concerns by accepting donations of kosher meat and dairy items (including cheesecake on Shavuot) from vetted, outside organizations, which previously provided such items.

As such, MDOC has not demonstrated that its current policies are the least restrictive means of achieving its asserted governmental interests.

## IV. Conclusion

In summary, the Court finds that Plaintiffs sincerely believe their religion requires them to consume meat and dairy on the Sabbath and the holidays of Rosh Hashanah, Yom Kippur, Sukkot, and Shavuot. Plaintiffs also sincerely believe that cheesecake is imperative for the Shavuot celebration. MDOC places a substantial burden on Plaintiffs' religious beliefs by mandating a vegan diet for inmates approved for a kosher diet. The burden is not alleviated by the availability of kosher meat and dairy products in the prison stores. MDOC fails to demonstrate that its policies further a compelling governmental interest or that they reflect the least restrictive means of furthering its interests. As such, Plaintiffs prove that MDOC has violated their rights under RLUIPA by failing to accommodate their

request for meat and dairy products on the Sabbath and the holidays set forth above.

In light of this finding, the Court is denying Defendant's Rule 52 motion and concludes that Plaintiffs are entitled to permanent injunctive relief under RLUIPA. The Court will grant the parties the opportunity to meet and confer to assess whether they can agree on the language of a permanent injunction for this Court to issue. Within fourteen (14) days of this Opinion, the parties shall submit agreed to language or, if agreement cannot be reached, Plaintiffs shall submit proposed language for a permanent injunction.

**IT IS SO ORDERED**.

                                        s/ Linda V. Parker
                                        LINDA V. PARKER
Dated: January 30, 2020                 U.S. DISTRICT JUDGE