# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540

Deborah S. Hunt      POTTER STEWART U.S. COURTHOUSE      Tel. (513) 564-7000

Clerk      CINCINNATI, OHIO 45202-3988      www.ca6.uscourts.gov

Filed: October 12, 2021

Mr. Daniel S. Korobkin
ACLU Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Mr. Daniel Edward Manville
Michigan State University College of Law
Immigration Law Clinic
P.O. Box 1570
East Lansing, MI 48826

Mr. Thomas J. Rheaume Jr.
Bodman
1901 Saint Antoine Street, Sixth Floor
Detroit, MI 48226

Mr. Zachary Austin Zurek
Office of the Attorney General of Michigan
P.O. Box 30217
Lansing, MI 48909

       Re:   Case No. 20-1363, *Gerald Ackerman, et al v. Heidi Washington*
               Originating Case No. : 4:13-cv-14137

Dear Counsel,

    The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

               Yours very truly,

               Deborah S. Hunt, Clerk

               Cathryn Lovely
               Deputy Clerk

cc:  Ms. Kinikia D. Essix

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0239p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GERALD ACKERMAN; MARK R. SHAYKIN,

        *Plaintiffs-Appellees*,

    *v.*

HEIDI E. WASHINGTON,

        *Defendant-Appellant*.

No. 20-1363

---

Appeal from the United States District Court for the Eastern District of Michigan at Flint.
No. 4:13-cv-14137—Linda V. Parker, District Judge.

Argued: April 22, 2021

Decided and Filed: October 12, 2021

Before: WHITE, NALBANDIAN, and READLER, Circuit Judges.

---

## COUNSEL

**ARGUED:** Scott A. Mertens, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Thomas J. Rheaume, BODMAN PLC, Detroit, Michigan, for Appellees. **ON BRIEF:** Scott A. Mertens, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Thomas J. Rheaume, BODMAN PLC, Detroit, Michigan, Daniel E. Manville, MICHIGAN STATE UNIVERSITY, East Lansing, Michigan, for Appellees.

---

## OPINION

---

NALBANDIAN, Circuit Judge. The Michigan Department of Corrections serves a universal religious diet to all prisoners with religious dietary needs. It created this meal plan to

avoid forcing prisoners to eat foods that violate their sincere religious beliefs. And because some religious beliefs forbid eating animal products, the universal religious meals are vegan. Because other prisoners require kosher food, the vegan meal is also kosher.

Gerald Ackerman and Mark Shaykin are Jewish prisoners confined in MDOC facilities. Their religious beliefs require them to eat a meal with kosher meat and a meal with dairy on the Jewish Sabbath and four Jewish holidays. They also believe that they must eat cheesecake on the holiday of Shavuot to celebrate the holiday properly. So they claim that MDOC policies that force them to eat vegan meals on these days substantially burden their sincere religious beliefs. And they argue that the MDOC needs to accommodate their beliefs under the Religious Land Use and Institutionalized Persons Act (RLUIPA). We agree and affirm the district court's judgment in the prisoners' favor.

I.

Before 2013, the Michigan Department of Corrections provided kosher meals with meat and dairy to Jewish prisoners. And the MDOC allowed charitable Jewish organizations to bring in traditional religious foods for Jewish holidays. But starting in 2013, the MDOC implemented a universal vegan meal for all prisoners who qualify for a religious diet. The MDOC also stopped the practice of allowing Jewish organizations to send food for holiday celebrations.

Ackerman and Shaykin claim that their religious convictions require them to eat a meal with kosher meat and one with dairy on the Jewish Sabbath and four Jewish holidays: Rosh Hashanah, Yom Kippur, Sukkot, and Shavuot. They brought a class action on behalf of all Jewish MDOC prisoners who share these beliefs against Heidi Washington, the MDOC's director.[1] They alleged, among other things, that the new vegan menu violated the Constitution and RLUIPA.

---

[1] This case was first brought by only a single *pro se* prisoner who did not raise class action allegations. But the district court ultimately allowed an amendment to the complaint that added class allegations. And the parties stipulated to have Ackerman and Shaykin substituted in as class representatives after the *pro se* plaintiff was paroled. In their briefing, the parties refer to the plaintiffs as "Ackerman and Shaykin" both before and after this substitution. We follow that approach here. And Washington is only party to this action because of her position in the MDOC, so we refer to the defendant-appellant as the government or the MDOC.

The MDOC moved for summary judgment, arguing that the prisoners did not sincerely believe that they needed to eat kosher meat. The district court at first granted summary judgment on that issue. But the prisoners moved to have the claim reinstated.[2] In support of their reinstatement argument, the prisoners relied on a rabbi's affidavit. The rabbi explained that "[a]ccording to accepted Jewish ritual and custom, each Sabbath meal consists of fish, chicken or meat as well" as "wine (or grape juice) and bread." (R. 125-2, Neustadt Aff, PageID 1441.) He cited (but did not quote) a provision of the Code of Jewish Law that says that a person "should be lavish with meat, wine, and sweets, according [to that person's] means" on Jewish holidays. Code of Jewish Law ch. 103 §3. And he explained that "[i]t is customary to eat dairy food on the first day of Shavuot." (R. 125-2, Neustadt Aff., PageID 1441.)

In an order granting the prisoners' request to reinstate the meat-and-dairy claim, the district court found that "the record . . . shows that Plaintiffs' sincerely held religious beliefs require them to consume kosher meat on the Sabbath and other Jewish holidays and dairy products on Shavuot." (R. 159, 54(b) Order, PageID 1862.)

The meat-and-dairy argument made it to trial. At trial before presentation of evidence, the district court reiterated and slightly broadened its previous sincerity finding: "[F]or the reasons that I stated in my order previously, this Court does, in fact, make th[e] finding that the plaintiffs in this case have demonstrated that they do in fact hold a sincerely held religious belief . . . [requiring] kosher meat and dairy products on their Sabbath and on the four specific Jewish holidays . . . set forth." (R. 233, Trial Tr., PageID 2311.) But "for the sake of the record," the district court "allow[ed] for testimony from either side on" sincerity. (*Id.* at 2313.)

At the bench trial, Ackerman and Shaykin both testified about their religious conviction that they should consume meat and dairy on various holidays. Both testified they had grown up eating a traditional kosher diet. And both testified that their religious texts mandate meat and dairy at meals on certain days. Shaykin referred to a provision of the Code of Jewish Law that says that "[e]very person should prepare fine meat, fish, choice wine, and other delicacies for the

---

[2]Although the MDOC's motion and the district court's summary judgment order addressed only consumption of meat, the focus turned to meat *and* dairy when the district court considered Plaintiffs' motion for reinstatement.

Sabbath meals to the fullest extent of his means"—meaning the individual prisoner's means. (R. 233, Trial Tr., PageID 2392, 2399.)  Ackerman explained the religious significance of the Sabbath and the four holidays as well as some of the traditional meals associated with these holidays (beef stew on the Sabbath, fish on Yom Kippur, and cheesecake on Shavuot).  About Rosh Hashanah, Ackerman said that "any refraction from [the holiday], any taking away from that reduces the heartfelt meaning of it to us" and "diminishes from the fullness of the holiday." (*Id.* at PageID 2322.)  Shaykin explained that when he can't eat meat and dairy as required he is "empty of everything."  (*Id.* at PageID 2351.)

The clean category of meat and dairy became somewhat messier when Shaykin testified that he was "supposed to eat" not just generic dairy but cheesecake on Shavut.  (*Id.* at PageID 2353.)  His testimony on the point was somewhat confusing though.  He also explained that "it"—presumably Jewish law—"just says dairy." (*Id.* at PageID 2357.)  And he agreed that "any dairy product would satisfy that requirement . . . in lieu of cheesecake." (*Id.* at PageID 2369.)  But he also said he wasn't a rabbi and thus couldn't speak definitively on the subject.  And strictly required or not, he testified that "it would fulfill [his] religious beliefs in a better way" to have cheesecake.  (*Id.* at PageID 2370.)

The court sought clarification on the practice of eating cheesecake on Shavuot from Ackerman, who was more familiar with Jewish law, by bringing him back to the stand.

Ackerman had not mentioned cheesecake in his initial round of testifying.  (*Id.*)  But given the chance to testify again, he explained that "Shavuot is genuinely associated with cheesecake in the Jewish community."  (*Id.* at PageID 2380.)  He called eating cheesecake a "ritual practice[]."  (*Id.*)  But he also testified that "arguably . . . a glass of milk" would be "fine." (*Id.* at PageID 2381-82.)  And he admitted that the Code of Jewish Law doesn't explicitly say cheesecake is mandatory.  But when asked about a passage in the code that references "a custom to just eat some dairy mezonot, cake, and beverage" on Shavuot, however, he said he read the passage to require cheesecake.  (*Id.* at PageID 2383-84.)

While Jewish prisoners on the new vegan diet like Ackerman and Shaykin do not receive any meat or dairy in the chow hall, prisoners can purchase certain snack-size, kosher-certified

meat (e.g., beef sticks, chicken sausage) and dairy products (e.g., dry milk, mac and cheese) with prices ranging from $0.95 to $4.42 at the prison commissary twice a month. Prisoners can make money working prison jobs or have friends and family put money into their prison accounts. If a prisoner's account has under $11 for a month, then the prison will loan money for commissary purchases. Prison wages range from about $0.84 to $2.62 per day. Commissary items may not, however, be brought into the chow hall to eat at mealtime.

Although Ackerman and Shaykin can buy meat and dairy products from the commissary, they have chosen instead to spend their money on things like hygiene products, popcorn, and coffee (used for bartering in violation of prison policy). And their purchases have not been insignificant in relation to their low wages and the cost of meat and dairy products. Ackerman regularly spends over $40 each month. And Shaykin has made multiple purchases over $100.

At trial, the prisoners did not dispute their purchase histories, but they testified that commissary snack purchases could not satisfy their religious needs because the Code of Jewish Law required "meals" rather than snacks. (*Id.* at PageID 2391-92, 2394.) So supplementation outside mealtime would not do: "We're required to eat this meat during the meal, the Sabbath meal." (*Id.* at PageID 2397.) The prisoners also claimed that commissary purchases would be insufficient because they couldn't afford portions large enough to satisfy their "meal" based religious requirements. (*Id.* at PageID 2322-24, 2363, 2392, 2397.)

The MDOC director of food service management and support testified that providing all Jewish inmates on the vegan diet with a piece of meat (turkey) for one meal on the days at issue would cost the MDOC about $10,000 each year. Providing milk would not increase costs because the MDOC already buys enough milk for these Jewish prisoners.[3] It just doesn't allow them to have any because they are on the vegan menu plan. The total annual MDOC food budget is about $39 million. And the MDOC currently recognizes twenty-eight religions.

After the bench trial, the district court asked for supplemental briefing on the precise scope of the relief sought because any possible pro-plaintiff ruling would need "to inform

---

[3]The MDOC's director of food service management and support testified that the $10,000 figure presumes that, on the relevant days, the MDOC would provide observant Jewish prisoners with milk in the morning and a meat product at the end of the day.

MDOC of the type of foods required for which Sabbath and holiday meals." (R. 235, Order for Supp. Br., PageID 2453-54.)[4]  The court allowed the parties to "attach an affidavit or other evidence to support their position." (*Id.* at PageID 2354.)

In support of their supplemental brief, the prisoners attached a rabbi's affidavit.  The rabbi explained that "the most significant foods" for Sabbath celebrations "are wine and meat, in addition to other delicacies." (R. 239-1, Neustadt Aff., PageID at 2475.)  And "the Code of Jewish Law explicitly states in Orach Chaim sec 250:2 that 'a person should add his meal with meat, wine and delicacies according to his ability.'" (*Id.*)  "Regarding the Festivals," he explained that "there is a clear obligation to eat meals which specifically include meat." (*Id.*) And he supported that assertion with religious texts that say things like "you should be lavish with meat, wine and sweets, according to your means." (*Id.* at PageID 2476 (quoting Code of Jewish Law ch. 103 §3).)

The district court issued a bench opinion ruling in the prisoners' favor.  It concluded that MDOC policies substantially burdened the prisoners' sincere religious beliefs "requir[ing] them to consume meat and dairy on the Sabbath and the holidays of Rosh Hashanah, Yom Kippur, Sukkot, and Shavuot." (R. 243, Bench Op., PageID 2542.)  And the MDOC had "fail[ed] to demonstrate that its policies further a compelling government interest or that they reflect the least restrictive means of furthering its interests." (*Id.*)  The district court ordered the MDOC to "provide . . . kosher meat and dairy products" "of a quantity comparable to the meat and dairy products served to all other prisoners" to these prisoners on the Jewish Sabbath and the four holidays. (R. 251, J., PageID 2620.) It also ordered the MDOC to "provide [the prisoners] kosher cheesecake on Shavuot." (*Id.*)

The MDOC appealed.

---

[4]In particular, the district court sought clarification because plaintiffs claimed to represent prisoners who require kosher "meat *and* dairy on each of the Sabbaths" and four identified holidays, but "[i]ndividuals maintaining a kosher diet do not eat meat and dairy together." (*Id.*) Ackerman and Shyakin explained that their beliefs require consumption of both meat and dairy on the specified days, but that the "consumption of the meat and dairy must be separated by at least four hours." (R.237, Pls.' Supp. Br, PageID 2462-63.)

II.

RLUIPA prohibits a state government from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). The Act defines "religious exercise" broadly to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A).

RLUIPA creates a burden-shifting framework for assessing prisoner claims. The prisoner bears the initial burden. She must show (1) her desired religious exercise is motivated by a "sincerely held religious belief" and (2) the government is substantially burdening that religious exercise. *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019). If the prisoner successfully shows the state substantially burdens a sincere religious belief, the burden shifts to the government to justify the burden on the religious adherent under the "daunting compelling interest and least-restrictive-means test," with a slight twist. *Id.* Courts must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).

"After a bench trial, we review the district court's factual findings for clear error and its conclusions of law de novo." *Fox v. Washington*, 949 F.3d 270, 276 (6th Cir. 2020) (quoting *Foster v. Nationwide Mut. Ins. Co.*, 710 F.3d 640, 643-44 (6th Cir. 2013)). Because sincerity is a "factual finding," *Cavin*, 927 F.3d at 459, clear error applies, *Fox*, 949 F.3d at 276. That means we will only disturb a sincerity finding when upon reviewing "the entire evidence" we are "left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *Osborn v. Griffin*, 865 F.3d 417, 436 (6th Cir. 2017)). The "decision on whether [a state's] actions impose[] a substantial burden . . . under RLUIPA is a question of law," as is the question of whether that burden serves a compelling interest in the least restrictive means, so we review those conclusions de novo. *Livingston Christian Schs. v. Genoa Charter Twp.*, 858 F.3d 996,

1001 (6th Cir. 2017); *see Hoevenaar v. Lazaroff*, 422 F.3d 366, 368 (6th Cir. 2005) ("[W]hether the prison regulations were the least restrictive means is a question of law"); *see also Holt v. Hobbs*, 574 U.S. 352, 363-67 (2015) (conducting de novo review).

The MDOC disputes the district court's conclusion under each RLUIPA prong. So we address each in turn.

### A.

The MDOC challenges the prisoners' sincerity about the need for meat and dairy on the Sabbath and four holidays. It also challenges the sincerity of their belief that they need to eat cheesecake on Shavuot. It faces a steep uphill challenge given both the nature of the sincerity inquiry and the clear-error standard of review applicable here.

RLUIPA's sincerity prong is not a difficult hurdle for prisoners. The sincerity prong just requires courts "'to determine whether the line drawn' by the plaintiff between conduct consistent and inconsistent with her or his religious beliefs 'reflects an honest conviction.'" *New Doe Child #1 v. Cong. of U.S.*, 891 F.3d 578, 586 (6th Cir. 2018) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014)).[5] Because "[s]incerity is distinct from reasonableness," courts do not inquire into whether a belief is "mistaken or insubstantial" even under the religious system to which the prisoner claims to adhere. *Id.* at 586-87 (quoting *Hobby Lobby*, 573 U.S. at 725). RLUIPA's sweep is not limited to reasonable or even orthodox beliefs—the reasonable and the unreasonable, the orthodox and the idiosyncratic all enjoy protection. *See id.*; 42 U.S.C. § 2000cc-5(7)(A). In the end, the sincerity requirement is just a

---

[5]Congress has enacted two parallel statutes "to provide very broad protection for religious liberty," "RLUIPA and its sister statute, the Religious Freedom Restoration Act of 1993 (RFRA)." *Holt*, 574 U.S. at 356 (quoting *Hobby Lobby*, 573 U.S. at 693). "In making RFRA applicable to the States and their subdivisions, Congress relied on Section 5 of the Fourteenth Amendment, but in *City of Boerne v. Flores*, 521 U.S. 507 (1997), [the Supreme] Court held that RFRA exceeded Congress' powers under that provision." *Id.* at 357. "Congress responded to *City of Boerne* by enacting RLUIPA, which applies to the States and their subdivisions and invokes congressional authority under the Spending and Commerce Clauses." *Id.* RLUIPA covers land-use regulation and prisoners' religious exercise. *Id.* And it "mirrors RFRA." *Id.* Caselaw interpreting RFRA is thus relevant in RLUIPA cases because "RLUIPA . . . allows prisoners 'to seek religious accommodations pursuant to the same standard as set forth in RFRA.'" *Id.* (quoting *Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal*, 546 U.S. 418, 436 (2006)).

"credibility assessment" that asks if a prisoner's religious belief is honest.  *Kay v. Bemis*, 500 F.3d 1214, 1219 (10th Cir. 2007) (citation omitted).

        None of this means that prisoners are foreordained to win in every case though.  Courts need not take a prisoner at his word and can "filter out insincere requests."  *Haight v. Thompson*, 763 F.3d 554, 565-66 (6th Cir. 2014).  That means that even though "sincerity rather than orthodoxy is the touchstone, a prison still is entitled to give *some* consideration to an organization's tenets" in assessing credibility.  *Id.* at 567 (quoting *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011) (Easterbrook, C.J.)).  "For the more a person's professed beliefs differ from the orthodox beliefs of his faith, the less likely they are to be sincerely held."  *Id.* (quoting *Vinning-El*, 657 F.3d at 594).  And it also means that courts can consider factors like length of adherence, knowledge about the belief system, and the existence of religious literature and teachings supporting the belief.  *See Fox*, 949 F.3d at 277-78.  Whether prisoners have "wavered in their dedication" also appears to be relevant to the sincerity analysis.  *Id.* at 278.  But this does not mean a religious observer "forfeit[s] his religious rights merely because he is not" completely "scrupulous in his observance; for where would religion be without its backsliders, penitents, and prodigal sons?"  *Grayson v. Schuler*, 666 F.3d 450, 454 (7th Cir. 2012) (Posner, J.).  "[E]ven the most sincere practitioner may stray from time to time."  *Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 791 (5th Cir. 2012), *as corrected* (Feb. 20, 2013).

i.

        We turn first to the prisoners' meat-and-dairy claim before addressing cheesecake in greater detail below.  Because the MDOC does not differentiate between meat and dairy for purposes of the prisoners' sincerity except as to cheesecake, we treat meat and dairy together rather than separately.  To the extent that the government could have argued that the prisoners believe one is required and not the other on any of the specific holidays, it has forfeited that argument.  Meat and dairy rise and fall together.

        Clear error?  No.  We reject the MDOC's lack-of-sincerity argument.  The district court did not clearly err given the facts supporting sincerity, especially the sincere belief that meat is mandatory on the specified holidays.

Consider the facts that suggest that Ackerman and Shaykin sincerely believe they need these items on religious holidays. Both were raised eating kosher diets in Jewish households that included meat and dairy. When asked if he had a "sincerely held belief" that required him "to eat those kosher meat and dairy products on the four Jewish holidays," Ackerman responded in the affirmative. (R. 233, Trial Tr., PageID 2320.) He said that failing to properly celebrate with these foods "diminishes . . . the fullness" and "heartfelt meaning" of holiday celebrations. (*Id.* at PageID 2322.) And Shaykin agreed that he "usually [ate] kosher meats and dairy" on religious holidays and that without those foods he "can't fulfill [his] obligation of being sincere in [his] religion." (*Id.* at PageID 2350, 2352.) Traditional celebratory foods consumed on the holidays support their assertion that meat and dairy are required (lox on Yom Kippur, cheesecake on Shavuot). A Jewish organization previously provided traditional holiday meat and dairy— cheesecake on Shavuot, lox on Yom Kippur, and pastrami and salmon on "high holidays." (*Id.* at PageID 2321, 2357.) The rabbi's post-trial affidavit also states that "there is a clear obligation to eat meals which specifically include meat" on holidays. (R. 239-1, Neustadt Aff., at PageID 2475.) And he grounded that conclusion in religious texts, providing, for example, that a practitioner "should be lavish with meat, wine and sweets, according to [the practitioner's] means." (*Id.* at PageID 2476 (quoting Code of Jewish Law ch. 103 §3).)

What about the Sabbath? Ackerman affirmed that he believes that he "need[s] to eat . . . kosher meat and dairy products" on the Sabbath. (R. 233, Trial Tr., PageID 2320.) And when asked about the Sabbath, Shaykin testified that the Code of Jewish Law "states that we must consume meats and dairy products." (*Id.* at PageID 2351.) These were not bald assertions. Shaykin identified religious literature at trial backing up the prisoners' claim that they need at least meat on the Sabbath: "Every person should prepare fine meat, fish, choice wine, and other delicacies for the Sabbath meals, and other delicacies for the Sabbath meals to the fullest extent of his means." (*Id.* at PageID 2392.) And the rabbi's post-trial affidavit explains that meat is among "the most significant" Sabbath foods. (R. 239-1, Neustadt Aff., at PageID 2475.)

The MDOC argues that the prisoners' belief is not sincere. It emphasizes that the Code of Jewish Law has a "means" limitation. (Appellant Br. at 3.) And although the prison commissary has kosher meat and dairy options and the prisoners have "means" to buy them,

the MDOC contends, the prisoners haven't chosen to spend their money on those items.  (*Id.* at 19-22.)

We agree with the district court that the "means" limitation does not undermine the sincerity of the prisoners' beliefs.  As the district court explained, "[t]here was no evidence presented as to what this excerpt from the [Code of Jewish Law] means, most importantly, to [the prisoners].  [The prisoners] did testify, however, that they believe their religious beliefs require them—despite their prison status and indigency—to consume meat and dairy during the Sabbath and four holidays."  (R. 243, Bench Op., PageID 2535.)

It is true that wavering dedication might suggest insincerity.  *See Fox*, 949 F.3d at 278; *Grayson*, 666 F.3d at 454 (observing that completely "scrupulous . . . observance" cannot be the standard).  And a complete lack of dedication could. *Cf. Moussazadeh*, 703 F.3d at 791 ("[E]ven the most sincere practitioner may stray *from time to time*." (emphasis added)).  But the commissary argument doesn't get the MDOC far.  As the prisoners testified, commissary purchases of meat wouldn't suffice because the Code of Jewish Law requires "meat *during the meal*," not as snacks or post-meal supplements.  (R. 2333, Trial Tr., PageID 2397 (emphasis added).)  And prison policy forbids taking commissary items into the chow hall for mealtime consumption.

The prisoners thus effectively deflate the state's case that commissary purchases show a lack of sincerity.  RLUIPA requires a practice-specific analysis.  42 U.S.C. § 2000cc-1(a) ("No government shall impose a substantial burden on the *religious exercise* of a [prisoner]." (emphasis added)); *id.* § 2000cc-5(7)(A) (defining "religious exercise" as "any exercise of religion"); *Holt*, 574 U.S. at 361-62 (explaining that RLUIPA "asks whether the government has substantially burdened religious exercise (here, the growing of a half-inch beard), not whether the RLUIPA claimant is able to engage in other forms of religious exercise").  And because the MDOC's policy regime completely bars the asserted practice here—eating meat and dairy *at mealtime*—Ackerman and Shaykin's failure to buy meat and dairy products at the commissary does not undermine the sincerity of their belief here.  *Cf. Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 815 (8th Cir. 2008) (noting, though not in the sincerity context, that a prisoner had failed to "address why less expensive food items available at the commissary, such as beans,

rice, tortillas, cheese, oatmeal, and peanut butter, could not serve as a substitute for the kosher meat entrées"). Just as "only permitting Catholic inmates to . . . observe the Sabbath on Thursdays" would be a substantial burden, *Fox*, 949 F.3d at 280, those same prisoners' refusal to do so surely would not show their beliefs about Sunday were somehow insincere, *cf. Moussazadeh*, 703 F.3d at 791 ("A finding of sincerity does not require perfect adherence *to beliefs expressed by the inmate* . . . ." (emphasis added)). The MDOC has failed to show that the district court clearly erred in finding the prisoners' meat and dairy at mealtime belief to be sincere.

ii.

The cheesecake issue is trickier. First, before trial, the prisoners made only a generic dairy argument and didn't argue that cheesecake is required on Shavuot. Second, the prisoner better versed in Jewish authority, Ackerman, never even mentioned cheesecake in his initial round of testimony. Third, both prisoners waffled in their assertion that cheesecake was required. Shaykin said that "any dairy product would satisfy" the law "in lieu of cheesecake." (R. 233, Trial Tr., at PageID 2369.) And Ackerman said, "arguably, we could drink a glass of milk, and that's fine." (*Id.* at PageID 2381.) Finally, religious texts don't say that cheesecake is mandatory—the Code of Jewish Law just notes that "[s]ome have a custom to just eat some dairy mezonot, cake, and beverage." (*Id.* at PageID 2383.)

But there's also evidence suggesting that these prisoners do in fact sincerely believe that cheesecake is required on Shavuot. First, when Shaykin was first asked if there was a food he was "supposed to eat" on Shavuot, he responded "cheesecake." (*Id.* at PageID 2353.) Second, while he stated that (in his non-rabbinical opinion) he thought other dairy products might do, he also said his beliefs would be "fulfill[ed] . . . in a better way" if he had cheesecake. (*Id.* at PageID 2369-70.) Third, it's clear that cheesecake is tied to Shavuot. Ackerman backed up Shaykin's testimony to that effect. And a Jewish organization previously provided it for the holiday celebration. Finally, Ackerman said he read the language in the Code of Jewish Law about a Shavuot "custom" as requiring him to consume cheesecake. (*Id.* at PageID 2383-84.)

Difficult questions with evidence cutting both ways are where deferential standards do their work. Clear-error review applies here, so we will only disturb the district court's sincerity finding on cheesecake if, given "the entire evidence," we are "left with the definite and firm conviction that a mistake has been committed." *Fox*, 949 F.3d at 276 (quoting *Osborn*, 865 F.3d at 436). We are not left with such a conviction. The district court reached the defensible conclusion that it should credit the prisoners' testimony that they believe cheesecake is mandatory on Shavuot. That's all that is required. Even if we may have come out differently on this issue if we were sitting as district judges, we affirm under the applicable standard of review.

B.

We turn next to RLUIPA's substantial-burden prong, which requires us to determine whether the "government . . . impose[es] a substantial burden" on these Jewish inmates' "religious exercise." 42 U.S.C. § 2000cc-1(a).

"[T]he Government substantially burdens an exercise of religion" under RLUIPA "when it 'places substantial pressure on an adherent to modify his behavior and to violate his beliefs or effectively bars his sincere faith-based conduct.'" *Fox*, 949 F.3d at 278 (quoting *New Doe Child #1*, 891 F.3d at 589). A prison does so by putting a prisoner to the choice of either "engag[ing] in conduct that seriously violates [his] religious beliefs" or "fac[ing] serious disciplinary action" or fines. *Holt*, 574 U.S. at 361 (second alteration in original) (citation omitted); *see Hobby Lobby*, 573 U.S. at 720 (concluding fines of "surely substantial" "sums" are a substantial burden). Of course, a prison also does so when it "prevents participation" in "sincerely" "motivated" conduct, *Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010), by "barring access to [a] practice" so there is no choice at all, *Haight*, 763 F.3d at 565. "The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)." *Id.*

In the religious-food context, precedent is clear that "barring access to the practice" of eating specific ceremonial foods "substantially burden[s] the practice." *Id.* And it is just as clear that "allow[ing] the inmates" access to other religious foods does not "make a difference." *Id.*

The MDOC substantially burdens the desired religious exercise here. Four overlapping principles guide our analysis.

First, RLUIPA's use of "religious exercise" (as opposed to "religion") tells us that the substantial-burden inquiry is practice specific. *See Holt*, 574 U.S. at 361-62; 42 U.S.C. § 2000cc-1; *see id.* § 2000cc-5 (defining "religious exercise" as "any exercise of religion"). So "whether the RLUIPA claimant is able to engage in other forms of religious exercise" makes no difference. *Holt*, 574 U.S. at 362; *see Haight*, 763 F.3d at 565 (allowing prisoners access to other religious foods is beside the point). This is true even if a prisoner can engage in activities like the desired religious exercise. *Haight*, 763 F.3d at 565 (allowing some ceremonial foods at a powwow while barring others did not mean the asserted religious exercise of eating the barred foods was not burdened); *Fox*, 949 F.3d at 280 (requiring prisoners to attend worship "services on the 'wrong' days with individuals whose beliefs they find 'obnoxious' . . . . would be no different from only permitting Catholic inmates to celebrate Christmas in July or observe the Sabbath on Thursdays" and would substantially burden religious exercise). As we observed in *Cavin*, allowing solo celebration of a Wiccan holiday but barring the desired communal worship a prisoner sincerely believed was required was a burden. 927 F.3d at 459. This was true despite the existence of the "second-best option [of] celebrating [alone] in his cell." *Id.* Focusing on the prisoner's ability to engage in a similar practice would "reframe[] the nature of what [the prisoner sought] to do: worship *with others* according to his beliefs." *Id.* (emphasis added). And reframing the issue in that way would flout *Holt*'s instruction that courts should not "look to 'whether the RLUIPA claimant is able to engage in other forms of religious exercise.'" *Id.* (quoting *Holt*, 574 U.S. at 362).

RLUIPA's exercise-specific analysis thus requires us to first identify the "religious exercise" at issue. And in so doing, we must avoid "re.fram[ing] the nature of" the desired exercise. *Id.* Here, the religious exercise is eating meat and dairy *as part of meals* on various holidays.[6] "What of a second-best option": vegan kosher meals and commissary snacks? *Id.* "[W]e cannot look to" them. *Id.* They are not the "exercise" at issue.

_____

[6] The MDOC concedes that the cheesecake belief, if sincere, is substantially burdened.

Second, there must be a burden on the exercise. That's met here. Prisoners on the universal religious diet cannot eat meat and dairy as part of their meals at mealtime. Period. And we've explained that "barring access" to a practice is a burden. *Haight*, 763 F.3d at 565; *see also Cavin*, 927 F.3d at 459 ("Barring group worship . . . burden[ed]" a Wiccan prisoner's desired "religious exercise" of communal worship despite "evidence that many Wiccans celebrate privately." The existence of a "second-best option"—worshiping "in his cell"—made the "burden . . . no less substantial.").

Third, RLUIPA is "[d]irected at obstructions institutional arrangements place on religious observances." *Cutter*, 544 U.S. at 720 n.8. "RLUIPA does not require a State to pay for an inmate's devotional accessories." *Id.* It "may," however, "require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c).

Here, several state-imposed roadblocks prevent the desired exercise.[7] Constraint number one: incarceration prevents prisoners from selecting their own meals. The prison chooses what to serve at mealtime. And MDOC prisoners who qualify for religious meals get the universal vegan diet. Constraint number two: prison policy forbids vegan-approved prisoners from consuming dairy in the chow hall even though it is available there. Constraint number three: prison policy bans outside food in the chow hall. So even if a prisoner has kosher meat from the commissary he wants to eat at mealtime, he can't. The MDOC is "barring access" to the religiously required food. *Haight*, 763 F.3d at 565.

Fourth, there is a severity requirement. Not all government-imposed burdens satisfy the test; "a burden must have some degree of severity to be considered 'substantial.'" *Livingston Christian*, 858 F.3d at 1003 (citation omitted). A categorical prohibition on a religious practice is, however, no doubt "substantial." *Haight*, 763 F.3d at 565. "The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)." *Id.*

---

[7]Of course, the burdens on religious observance must be imposed by the state and not non-state actors or be the result of outside forces. For example, "the economic reality of the marketplace does not constitute a substantial burden under RLUIPA." *Patel*, 515 F.3d at 813-14; *Cutter*, 544 U.S. at 721.

For these reasons, the MDOC imposes a substantial burden on the asserted religious exercise of eating meat and dairy as part of meals on various holidays by completely barring the practice.

The MDOC resists this conclusion by pointing to the prisoners' ability to purchase kosher meat and dairy items at the prison commissary. The MDOC's argument is essentially that the government is not imposing a burden. Rather, any burden on these prisoners' exercise arises out of their own purchase choices at the commissary rather than state roadblocks. It claims it is not imposing any burden on these prisoners' exercise because they can purchase low-cost kosher meat and dairy products at the prison commissary. They have simply not chosen to do so, the MDOC says, electing instead to spend their money on things like coffee, shampoo, and popcorn. Adding some nuance to its argument, the MDOC points to *Cutter*, which noted in a footnote that RLUIPA "does not require a State to pay for an inmate's devotional accessories." 544 U.S. at 720 n.8. And it relies on that language to argue that the state does not burden a belief by simply failing to underwrite it.

There's some appeal to the MDOC's commissary/*Cutter* argument. And perhaps faced with a different set of facts, that argument might be persuasive.[8] *See Patel*, 515 F.3d at 813

___

[8]Would there be a substantial state-imposed burden if the prisoners could bring food from the commissary into the chow hall to eat with their state-provided meals? Perhaps not. *See Cutter*, 544 U.S. at 720 n.8; *Patel*, 515 F.3d at 814 (noting that without "evidence regarding [a prisoner's] financial status" "[r]equiring him to purchase commissary meals does not significantly inhibit, meaningfully curtail, or deny [him] a reasonable opportunity to practice his religion"). *But see Moussazadeh*, 703 F.3d at 793 (reading *Cutter*'s language narrowly to apply to "religious items, not food," and holding that "denial of religiously sufficient food where it is a generally available benefit would constitute a substantial burden on the exercise of religion"). This case is unlike *Haight* in that the prisoners are not offering to self-finance the religious exercise by buying the religious foods. *Compare Haight*, 763 F.3d at 560 ("The inmates made repeated requests to purchase food . . . and offered to pay for the food themselves."), *with Patel*, 515 F.3d at 815 ("Patel does not offer to purchase meals from the commissary but instead demands that he receive meals from the commissary at the BOP's expense, regardless of whether he is able to purchase them."). And it's true that the prison does facilitate the prisoners' ability to purchase meat and dairy products by allowing them to earn (admittedly low) wages, letting friends/family deposit money into prisoner accounts, and allowing a third-party vendor to sell low-cost food at the commissary. Additionally, Ackerman and Shaykin have enough money to make substantial purchases in relation to their low wages (though they contest whether they have enough funds to buy meat and dairy products from the commissary regularly "in the quantities needed to constitute a Sabbath or holiday meal"). (R. 243, Bench Op., PageID 2531.) And religion often does require sacrifices from adherents; indeed, Jewish law appears to contemplate expenditure of "means" to celebrate these holidays.

If the MDOC's no-commissary-food-in-the-chow-hall policy were not in place, we would need to determine whether requiring the prisoners to purchase food at a commissary imposes a substantial burden. And perhaps in the right case, food options at a commissary might render any burden insubstantial. *See, e.g., Patel*,

("Courts generally have found that no 'substantial burden' exists if the regulation merely makes the practice of a religious belief more expensive."). *But see Jones v. Carter*, 915 F.3d 1147, 1150-51 (7th Cir. 2019) (holding "there can be no doubt that when the state forces a prisoner to give away his last dime so that his daily meals will not violate his religious practice, it is imposing a substantial burden," but declining, over a dissenting opinion, to "scrutinize . . . ability to pay" given the Supreme Court's refusal, over criticism in dissent, to analyze "the question of ability to pay" in *Hobby Lobby*). But the MDOC fails to grapple with the elephant in the room— prison policies completely *bar* prisoners from eating any meat or dairy *as part of their meals at mealtime*. And by urging us to look to the commissary options as minimizing or eliminating any burden, MDOC is asking us to do precisely what we cannot do under *Cavin*—"reframe[] the nature of what [the prisoners] seek[] to do." 927 F.3d at 459. "[A] second-best option" under *Cavin* is not an option for purposes of the substantial-burden inquiry. *Id.* So even if a prison's choice to minimize burdens by allowing prisoners to earn wages and buy commissary items might in some case take the wind out of a prisoner's claim, that's not what we have here. The prisoners' ability to purchase commissary kosher meat and dairy items is irrelevant. Even if these prisoners spent every last penny on beef sticks and dry milk, prison policy would still bar their religious exercise of eating those items as part of their meals.[9]

The prisoners have shown their sincere beliefs are being substantially burdened, so the burden now shifts to the government to justify the burden.

---

515 F.3d at 814 ("While [requiring commissary meat purchases] places a financial burden upon him, Patel has not shown that it is substantial" because of lack of evidence of "potential cost" and "financial status. Requiring him to purchase commissary meals does not significantly inhibit, meaningfully curtail, or deny Patel a reasonable opportunity to practice his religion." (footnote omitted)). In that alternate universe, possible state-imposed burdens would be things like the effect of incarceration on the ability of persons to access money, the relationship between commissary costs and prison wages, the state's role in choosing what to sell at the commissary as well as portions available there, and limits on the ability to purchase sufficient food because of prisoners' need for other necessary items like hygiene products. *See Abdulhaseeb*, 600 F.3d at 1317 ("[A]ny ability to purchase is chimerical where a plaintiff is indigent . . . ."). We need not comment more on that alternate universe though. We're here, not there.

[9] The MDOC relies on *Robinson v. Jackson*, 615 F. App'x 310 (6th Cir. 2015). In *Robinson*, this court held that the Ohio Department of Rehabilitation and Correction did not substantially burden a Muslim prisoner's religious exercise by serving him halal vegetarian meals instead of halal meat meals. 615 App'x at 313-14. *Robinson* is distinguishable. In *Robinson*, the vegetarian meals satisfied the prisoner's own definition of halal, and he did not claim that he needed to eat meat, only that any meat consumed must be halal. *Id.* at 311, 313. Here, by contrast, the MDOC's universal vegan meals impede Ackerman and Shaykin's religious practices.

## C.

Once a prisoner makes out the prima facie RLUIPA case, the burden shifts to the government to show that the imposition of the burden passes strict scrutiny, "a tough gauntlet." *Haight*, 763 F.3d at 566. The first strict scrutiny step requires the prison to show that the burden "is in furtherance of a compelling governmental interest." 42 U.S.C. § 2000cc–1(a)(1).

RLUIPA "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt*, 574 U.S. at 363 (cleaned up). Courts do so by weighing the government's actual "interest against 'the burden on [the] person' bringing a claim." *Haight*, 763 F.3d at 562-63 (quoting 42 U.S.C. § 2000cc-1(a)). And that means courts scrutinize "the asserted harm of granting specific exemptions to particular religious claimants" by looking "to the marginal interest in enforcing" the burden "in [the] particular context" of the prisoner at issue. *Holt*, 574 U.S. at 363 (quoting *Hobby Lobby*, 573 U.S. at 726-27).

Because the focus is on the interest in burdening the specific prisoner, the state's interest in merely avoiding other and additional accommodations—a slippery slope—is usually insufficient. "At bottom, this argument is but another formulation of the 'classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions.'" *Id.* at 368 (quoting *O Centro*, 546 U.S. at 436). But a "no-exception policy" "has no place as a stand-alone justification under RLUIPA" because "accommodations" or "exceptions" are the entire point of the Act. *Haight*, 763 F.3d at 562. That's not to say that courts must turn a blind eye to the effect of cascading accommodations. As the *Holt* Court suggested, slippery-slope arguments might be persuasive when there is "a compelling interest in cost control or program administration." *See* 574 U.S. at 368; *cf. United States v. Lee*, 455 U.S. 252 (1982) (refusing to grant an exemption under the Free Exercise Clause from paying social security tax because of the complexity of the tax scheme and the need for mandatory participation).

Although strict scrutiny is a high hurdle under RLUIPA (as it is everywhere in the law), it is not as "strict" here as it is elsewhere. Prison administrators receive some benefit of the doubt when their policies come under attack. So when reviewing a policy under RLUIPA, courts must give "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723.

Are the state-imposed burdens here supported by a compelling state interest?

RLUIPA "requires the Government to demonstrate that the compelling-interest test is satisfied through application of the challenged law to the person." *Holt*, 574 U.S. at 363 (cleaned up) (citation omitted). Here, "the challenged law" is the combination of prison policies (universal religious diet, bar on commissary food in chow hall, rule that prisoners on the vegan religious diet may not eat non-vegan food in chow hall) that force Jewish prisoners to eat exclusively vegan meals.

The MDOC's asserted interests? Keeping costs down by avoiding the $10,000 expenditure needed to provide the requested foods. Orderly administration of meals, including the increased costs of meat and dairy add-ons. Administrative burdens of providing add-ons. And the potential for costs spiraling out of control as other prisons also request add-ons.

The interest in simply avoiding an annual $10,000 outlay here is not compelling. This is true even deferring, as we must, "to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures . . . consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723. The MDOC annual food budget is $39 million. And $10,000 is just a tiny .02% drop in that multi-million-dollar-food-budget bucket. *See Moussazadeh*, 703 F.3d at 795 ("[W]e are skeptical that saving less than .05% of the food budget constitutes a compelling interest."). RLUIPA, moreover, "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." 42 U.S.C. § 2000cc-3(c).

What about the potential cost-related interest of avoiding spending government funds in ways that may run up against the Establishment Clause? Unlike *Haight*, where "the inmates

. . . offered to pay for the food themselves," the prisoners here made no such offer, demanding instead to receive state-funded food. *Haight*, 763 F.3d at 560. This difference may have important implications under *Cutter*. *See* 544 U.S. at 720 n.8. There, the Supreme Court held that "RLUIPA fits within the corridor between the Religion Clauses," so "[o]n its face, the Act qualifies as a permissible legislative accommodation of religion that is not barred by the Establishment Clause." *Id.* at 720. But it also noted that RLUIPA "does not require a State to pay for an inmate's devotional accessories," suggesting, in the context of its holding, that at least some state financing of "devotional accessories" might violate the Establishment Clause. *Id.* at 720 n.8. And in support of that proposition, it cited a Seventh Circuit case "overturning [a] prohibition on possession of Islamic prayer oil but leaving [an] inmate-plaintiff with [the] responsibility for purchasing the oil." *Id.* (citing *Charles v. Verhagen*, 348 F.3d 601, 605 (7th Cir. 2003)). The prisoners' request for state-financed food thus may implicate a possible state interest in avoiding running up against the Establishment Clause.[10] And this possibility highlights that there may be some tension between *Cutter*'s footnote and the fact that RLUIPA "may require a government to incur expenses." 42 U.S.C. § 2000cc-3(c). But we need not weigh in on that possibility here. The state (which bears the burden at this step of RLUIPA) has not argued that an anti-establishment interest supports the religious burden at issue, and so we decline to address this other potential cost-related state interest.

What about the state's interest in avoiding this accommodation to service its interest in orderly administration of meals? Like the potential *Cutter* point, the MDOC fails to develop this argument. The only argument it presses on this point merely points to increased cost, so it fails for the same reason its annual cost argument does.

Recognizing deficiencies with the interest in avoiding this specific exception, the MDOC focuses on a slippery-slope argument—if we grant this exception, our "kitchens would be turned into" an unwieldy and expensive "religious-accommodation buffet." (Reply at 24.) At first, this

---

[10]Other circuits might disagree. *See Moussazadeh*, 703 F.3d at 793 (reading *Cutter*'s footnote narrowly to apply to "religious items, not food"); *Jones*, 915 F.3d at 1150-51 (holding "there can be no doubt that when the state forces a prisoner to give away his last dime so that his daily meals will not violate his religious practice, it is imposing a substantial burden" and declining to "scrutinize . . . ability to pay" given *Hobby Lobby*). Of course, the food at issue in a RLUIPA case must have some religious significance or else there is no claim in the first place.

argument seems like the type of argument that *Holt* and *Haight* say do not, without more, cut it under RLUIPA. As *Haight* puts it, exceptions are the point of the statutory scheme. 763 F.3d at 561-62. But *Holt* also suggests that this type of argument might have some bite where there is "a compelling interest in cost control or program administration." 574 U.S. at 368. And that's precisely the context we have here. The MDOC is not simply arguing that the one exception will lead to another. It is arguing that the potential spiraling effect will lead to administrative burdens and excessive costs.

That said, we can dispose of the MDOC's spiraling administrative burden argument easily here. The MDOC simply has not done the legwork in its briefing to show how the desired accommodation or future ones will increase administrative burdens by, for example, requiring more kitchen space than what is available. The MDOC made these arguments below,[11] but failed to develop them on appeal. The MDOC has thus abandoned any spiraling administrative burden argument it might have raised on appeal. *See Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1063 (6th Cir. 2014).

Resolving the spiraling cost issue is a bit harder. The requested accommodation here, which only deals with the Sabbath and four other days, would up costs by $10,000. The MDOC recognizes twenty-eight religions, and one can imagine a world in which several other religious prisoners requested religion-specific meal add-ons on potentially a greater number of days. Costs could easily balloon in that situation. And we defer to prison officials in doing this analysis. But deference does not mean blind deference.

There are at least a few problems with the MDOC's argument. First, the MDOC's briefs (and arguments to the district court) don't do a great job walking through the possibility with specifics showing that others might request an accommodation. Are there realistic risks that many others would request similar accommodations? We don't know; the only thing the MDOC has told us is that there are twenty-eight recognized religions without specifying what the

---

[11] In the MDOC's trial brief, it argued that "[p]roviding even a handful of differing diets to prisoners would be a near-impossible task for MDOC to accomplish given the cost of nutritional analysis, menu and recipe development, contract procurement, limited food preparation/storage space, and limited manpower to develop and oversee the administration of such varying requirements." (R. 207, MDOC Trial Br., 2114.)

religious-food implications of that number might be. Even a few more requests that impose similar costs would leave the cost relative to the budget extremely low. Second, the MDOC did in fact provide similar exemptions in the past (pre-packaged kosher meals and other religious meals) on more calendar days. Although we are wary of creating a one-way ratchet, the sky hasn't fallen yet. And the MDOC doesn't tell us why it is about to in Michigan.

Finally, the complexity and need to avoid exemptions here seems different from what is contemplated by cases like *Lee* that deal with mandatory participation in complex tax schemes, which may be what *Holt* was referring to when it referenced cost and administrative burdens.**12** And the prisoners are not requesting complete exclusion from the universal diet—they are asking for low-cost supplementation (based on trial testimony, cartons of milk and four ounces of turkey would do at least for most of the days). For these reasons, the burdens here do not serve compelling state interests.

One final note. At trial, an MDOC employee testified that providing the inmates with a carton of milk would impose no cost because the MDOC already has milk to spare. It just doesn't allow them to have any because they are on the vegan menu plan. So there's no cost-reduction interest for milk. And it is hard to contemplate any added administrative burden if the prisoners were simply allowed to grab a carton on each day at issue. It seems the prison does not have any interest, let alone a compelling one, in avoiding this simple accommodation.

### D.

Not only must a prison show that the burden serves a compelling interest, it must also show that the burden "is the least restrictive means of furthering [the] compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(2). This "standard is 'exceptionally demanding,' and requires the government to 'sho[w]' that it lacks other means of achieving its desired goal without

---

**12**In *Lee*, a free-exercise case, the Court refused to grant an Amish carpenter an exemption from the obligation to pay social security taxes for his employees. *Id.* at 261. Holding there was a compelling interest, the Court noted that "mandatory participation is indispensable to the fiscal vitality of the social security system." *Id.* at 258. And "providing for voluntary participation" would be "difficult, if not impossible to administer." *Id.* Simply put, a tax system "could not function" with religious exemptions. *Id.* at 260. Because the government's interest in uniform and mandatory participation was "very high," the Court held that "religious belief in conflict with the payment of taxes affords no basis for resisting the tax." *Id.* at 259-60.

imposing a substantial burden on the exercise of religion by the objecting part[y].'" *Holt*, 574 U.S. at 364 (alterations in original) (quoting *Hobby Lobby*, 573 U.S. at 728). Despite the deference to prison administrators that RLUIPA calls for, the government faces a steep uphill battle when other prison systems can accommodate a particular religious practice. "[W]hen . . . many prisons offer an accommodation, a prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Id.* at 369.

The parties devote little time to this issue. Their arguments revolve around the possibility that a Jewish organization might be willing to provide the needed food items on at least some days—a practice that existed before the MDOC changed policies to bar these donations. The MDOC asserts that this is not a viable alternative because there is no evidence that any organization is currently willing to provide kosher meals, volunteer organizations never provided Sabbath food, at times visitors cannot enter prisons, and allowing volunteers to provide kosher meals poses security concerns.

The government's arguments are unpersuasive. *Holt* says that when other prison systems provide a similar accommodation, a prison faces a steep uphill battle. Here, there isn't evidence of other prison systems allowing outside parties to provide free kosher goods to prisoners; there is evidence of *this* prison system allowing that very practice. The MDOC has the burden on this issue, and it hasn't pointed to any security problems that happened because of that practice. Indeed, the MDOC never tells us why it cut off the practice.

More problematically, the donation ban is not the only roadblock here. In fact, it is far from clear that this burden is the one we should be thinking about. Here, several other barriers restrain the desired exercise—the vegan-meal policy, the ban on bringing in commissary food, and the ban on vegan-religious-diet prisoners eating meat and dairy in the chow hall. And the MDOC doesn't even address whether these burdens are the least restrictive means for serving a compelling interest. Especially problematic for the MDOC, it fails to defend its bar on bringing commissary food into the chow hall. By focusing its argument on only one policy, it fails to carry the burden of justifying the others.

Ultimately, the MDOC's argument rests on the faulty proposition that the commissary alleviates any burden on the desired exercise. And so its least-restrictive-mean argument fails for the same reason its compelling-interest one does. It has failed to carry its burden under RLUIPA.

III.

The MDOC substantially burdens these prisoners' sincere religious beliefs, and the MDOC has not shown that the burdens serve a compelling interest in the least restrictive way. We **AFFIRM**.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 20-1363

GERALD ACKERMAN; MARK R. SHAYKIN,

    Plaintiffs - Appellees,

    v.

HEIDI E. WASHINGTON,

    Defendant - Appellant.

```
┌─────────────────────────────────┐
│            FILED                 │
│         Oct 12, 2021             │
│    DEBORAH S. HUNT, Clerk        │
└─────────────────────────────────┘
```

Before: WHITE, NALBANDIAN, and READLER, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court for the Eastern District of Michigan at Flint.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk